**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| E-WATCH INC., et al., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Case No. 2:13-CV-1061-JRG-RSP |
| | § | LEAD CASE |
| APPLE, INC., | § | |
| | § | |
| *Defendant.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

On January 16, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 7,365,871 ("the '871 Patent") and 7,643,168 ("the '168 Patent") (collectively "the Asserted Patents"). After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 216, 224, and 231), the Court issues this Claim Construction Memorandum and Order.

# TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................... 3

II.     APPLICABLE LAW ........................................................................................... 5

III.    CONSTRUCTION OF AGREED TERMS ....................................................... 9

IV.     CONSTRUCTION OF DISPUTED TERMS ................................................. 10

        A.      "by the user" ........................................................................................ 10

        B.      "set-up" ................................................................................................ 15

        C.      "the portable housing being wireless" ................................................ 17

        D.      "adapted for transmitting" .................................................................. 20

        E.      "processor" phrases ............................................................................. 22

        F.      "manually portable housing," "handheld," and "portable housing" ................... 30

        G.      "supported/supporting/supports" ........................................................ 33

        H.      "self-contained" .................................................................................. 35

        I.      "input keys," "keypad," and "a set of input keys" ............................. 36

        J.      "image data signal(s)" and "viewing incoming image data signals" ................. 41

        K.      "image framed by the camera" and "generating a digitized framed image" ....... 44

        L.      "digitiz[e][ed][ing]" ........................................................................... 47

        M.      "telephone network" ............................................................................ 51

        N.      "selectively transmitting" and "selectively displaying" ..................... 53

        O.      "camera control circuit" ...................................................................... 56

        P.      "transmission protocol" ....................................................................... 58

        Q.      "media" ................................................................................................ 60

        R.      "viewfinder" ........................................................................................ 63

        S.      "processing platform" .......................................................................... 66

V.      CONCLUSION ................................................................................................ 69

## I. BACKGROUND

The Asserted Patents are titled "Apparatus for Capturing, Converting and Transmitting a Visual Image Signal via a Digital Transmission System," and generally share a common specification. The Asserted Patents relate to an apparatus used for image capture, conversion, compression, storage, and transmission. *See* '168 Patent at Abstract.[1] The specification states that a camera and a signal converter may be incorporated into an integrated unit "wherein the converted signal may be transmitted on a real time basis or may be stored in memory for later recall and transmission." *Id.* at 2:28–31. The specification adds that this design "permits maximum flexibility, with the camera/converter/telephone or other transmission device being designed in a modular configuration wherein any or all of the devices may exist as integrated or independent units." *Id.* at 2:32–36. For example, Figure 6B illustrates "a basic portable system, with a battery powered portable module 160 having a self-contained power source 162." *Id.* at 11:24–26.

---

[1] The Abstract of the '168 Patent follows:

An image capture, conversion, compression, storage and transmission system provides a data signal representing the image in a format and protocol capable of being transmitted over any of a plurality of readily available transmission systems and received by readily available, standard equipment receiving stations. In its most comprehensive form, the system is capable of sending and receiving audio, documentary and visual image data to and from standard remote stations readily available throughout the world.



FIG. 6B

The specification adds that this system "may include an integral RAM and/or the removable memory module as indicated by the image card 72," and that "camera 10 may be an integral feature of the portable module 160, or may be a detached unit, as desired." *Id.* at 11:26–30. The specification further states that "cellular telephone 164 is provided with a data jack 166 for connecting to the output jack 168 of the module, whereby the image data signal may be transmitted via the cellular telephone to a remote facsimile machine over standard cellular and telephone company facilities." *Id.* at 11:30–35. As an alternate embodiment, the specification states that "where desired, an integral cellular phone can be incorporated in the camera housing and transmission can be sent directly from the camera housing to a remote receiving station." *Id.* at 12:1–4.

Regarding the camera, the specification states that the video image may be captured "using a digital camera, an analog camera, or a video camera such as a camcorder." *Id.* at 2:37–39. The specification adds that "[t]he captured video image is then converted into still frame digitized format for transmission over any of a variety of transmission systems." *Id.* at 2:39–41. The specification further states that "once the signal is digitized, the transmission protocols are virtually endless." *Id.* at 2:43–45.

Plaintiff brings suit alleging infringement of claims 1–6 and 12–15 of the '871 Patent, and claims 1–6, 8, 10, 11, 13–29, and 31 of the '168 Patent. Claim 1 of the '871 Patent is an exemplary claim and recites the following elements (disputed terms in italics):

> 1. A *handheld self-contained* cellular telephone and integrated image processing system for both sending and receiving telephonic audio signals and for capturing a visual image and transmitting it to a compatible remote receiving station of a wireless *telephone network*, the system comprising:
>
> a *manually portable housing*;
>
> an integral image capture device comprising an electronic camera contained within the portable housing;
>
> a display for displaying an i*mage framed by the camera*, the display being supported by the housing, the display and the electronic camera being commonly movable in the housing when the housing is moved by hand;
>
> *a processor in the housing for generating an image data signal representing the image framed by the camera*;
>
> a memory associated with the processor for receiving and storing the *digitized* framed image, accessible for *selectively displaying* in the display window and accessible for *selectively transmitting* over the wireless *telephone network* the *digitized* framed image;
>
> a user interface for enabling a user to select the *image data signal* for viewing and transmission;
>
> a telephonic system in the housing for sending and receiving *digitized* audio signals and for sending the *image data signal*;
>
> alphanumeric *input keys* in the housing for permitting manually input *digitized* alphanumeric signals to be input to the processor, the telephonic system further used for sending the *digitized* alphanumeric signals;
>
> a wireless communications device *adapted for transmitting* any of the *digitized* signals to the compatible remote receiving station; and
>
> a power supply for powering the system.

## II.    APPLICABLE LAW

## A. Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics*

*Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

## B. Construction Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112(b). Whether a claim meets this definiteness requirement is a matter of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368 (Fed. Cir.2014). The ultimate issue is whether someone working in the relevant technical field could understand the bounds of a claim. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010). Specifically, "[a] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. ___ , ___ (2014) (slip. op., at 1).

## C. Means-plus-function Analysis

Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must

turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

However, "'a claim term that does not use 'means' will trigger the rebuttable presumption that § 112, ¶ 6 does not apply.'" *LightingWorld, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004) (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002)). This presumption can be rebutted "by showing that the claim element recite[s] a function without reciting sufficient structure for performing that function." *Watts v. XL Sys.*, 232 F.3d 877, 880 (Fed. Cir. 2000) (citing *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999)). However, the presumption "is a strong one that is not readily overcome." *Lighting World, Inc.*, 382 F.3d at 1358. "In cases where the claims do not recite the term 'means,' considering intrinsic and extrinsic evidence is usually helpful, as the litigated issue often reduces to whether skilled artisans, after reading the patent, would conclude that a claim limitation is so devoid of structure that the drafter constructively engaged in means-plus-function claiming." *Inventio AG v. Thyssenkrupp Elevator Ams. Corp.*, 649 F.3d 1350, 1357 (Fed. Cir. 2011).

### III.   CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| **housing** ('871 Patent, claims 1, 4, 6, 8, 9, 10, 12, 13, 15) | an enclosing structure |
| **alphanumeric** ('871 Patent, claims 1, 3, 6, 7, 9, 12) | characters consisting of letters and/or digits |
| **electronic camera** ('871 Patent, claims 1, 6, 9, 12) | a camera that operates electronically |
| **housing** ('168 Patent, claims 1, 3, 4, 19, 20, 21, 22, 24, 26, 27, 29) | an enclosing structure |
| **image collection device** | a device for capturing images |

| | |
|---|---|
| ('168 Patent, claims 1, 8, 19, 21, 22, 24, 26, 27, 29) | |
| **compress[ed][ion]** <br> ('168 Patent, claims 1, 6, 16, 18, 22, 24, 26, 27, 29) | represent in a more compact manner |
| **a display screen apart from the viewfinder** <br> ('168 Patent, claims 23, 25, 28, 31) | the display screen is separate from the viewfinder |
| **compression algorithm** <br> ('168 Patent, claims 1, 22, 24, 26, 27, 29) | No construction necessary |

Dkt. No. 241 at 10, 12. In view of the parties' agreements on the proper construction of each of the identified terms, the Court hereby **ADOPTS AND APPROVES** the parties' agreed constructions.

## IV. CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of eight terms/phrases in the '168 Patent and twenty-one terms/phrase in the '871 Patent.[2]

### A. *"by the user"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"by the user"** | Not Indefinite | Indefinite |

The parties dispute whether the independent claims of the '168 Patent are indefinite. Defendants argue that the independent claims fall squarely within *IPXL* and its progeny by improperly mixing apparatus and method elements. (Dkt. No. 224 at 9) (citing *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005)). Specifically, Defendants argue that the phrase "operation of the input device by the user," the phrase "movement by the

---

[2] The Court notes that the parties did not present oral arguments for the following terms/phrases: "setup," "the portable housing being wireless," "adapted for transmitting," "supported/supporting/supports," "image data signal(s)," "viewing incoming image data signals," "image framed by the camera," "generating a digitized framed image," "telephone network," "selectively transmitting," "selectively displaying," "circuit," "transmission protocol," "media," "viewfinder," and "processing platform."

user of the portable housing commonly moving the image collection device," and the phrase "movement by the user of the portable housing commonly moving the display," recite steps that must be performed by the user. (Dkt. No. 224 at 9.) According to Defendants, the recitation of these phrases improperly mixes apparatus and method limitations, making each independent claim indefinite, and thus invalid under 35 U.S.C. §112, ¶ 2. (Dkt. No. 224 at 10.)

Defendants further argue that these method steps are not mere functional limitations, but instead are stand-alone limitations. (Dkt. No. 224 at 10.) According to Defendants, the '168 Patent claims cover not only the apparatus and its hardware components, but also the acts of operating and moving the apparatus. (Dkt. No. 224 at 10.) Defendants further argue that the claims specifically state that the "operation" and "movement" steps are performed "by the user," and external input by a person cannot be a functional description of the capabilities of a claimed device. (Dkt. No. 224 at 10.)

Plaintiff responds that the independent claims of the '168 Patent set forth certain functional limitations of the claimed apparatus, and do not mix apparatus and method claims. (Dkt. No. 231 at 3.) Plaintiff argues that apparatus claims that use functional language are "not necessarily indefinite." (Dkt. No. 231 at 3.) (quoting *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008)). Plaintiff contends that reading the phrase "by the user" in context makes clear that the phrase describes the capabilities of the claimed apparatus. (Dkt. No. 231 at 4.) Plaintiff argues that the phrase "operation of the input device by the user enabling the memory," refer to the capabilities of the input device to cause the memory to retain a visual data image. (Dkt. No. 231 at 4.) Plaintiff further argues that nowhere does the claim language require a user to perform any steps to infringe. (Dkt. No. 231 at 4.)

Plaintiff next contends that the phrase "movement by the user of the portable housing

commonly moving the image collection device," and the phrase "movement by the user of the portable housing commonly moving the display," refer to the physical characteristic that the image collection device and display move contemporaneously with the portable housing. (Dkt. No. 231 at 4.) According to Plaintiff, the user need not move the apparatus to infringe, and the recitation of "by the user" does not introduce indefiniteness. (Dkt. No. 231 at 4.)

For the following reasons, the Court finds that the claims of the '168 Patent are indefinite because they improperly include method steps in apparatus claims.

### 1. Analysis

The phrase "operation of the input device by the user …" appears in claims 1, 22, 24, 26, 27, and 29 of the '168 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The Court further notes that the phrase appears in all of the independent claims, and is therefore incorporated into all of the dependent claims of the '168 Patent. The phrase "movement by the user of the portable housing commonly moving the image collection device" appears in claims 1, 22, and 24 of the '168 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "movement by the user of the portable housing commonly moving the display" appears in claims 1, 22, and 24 of the '168 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim.

Focusing on the claim language, the Court finds that a plain reading of the claims require a step to be performed "by the user." Moreover, it is undisputed that all of the independent claims are apparatus claims. Thus, the Court agrees with Defendants that the claims are indefinite under the Federal Circuit's holding in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005). In *IPXL*, the Federal Circuit addressed a claim that covered a system

with "an input means" and required a user to use the input means. *Id.* at 1384. The court held that the claim was indefinite because it was unclear "whether infringement . . . occurs when one creates a system that allows the user [to use the input means], or whether infringement occurs when the user actually uses the input means." *Id.* The Court finds the same here, because the independent claims recite both an apparatus and a method for using the apparatus.

Plaintiff contends that this claim language does not require a user to perform any steps to infringe. (Dkt. No. 231 at 4.) Specifically, Plaintiff argues that the phrase "operation of the input device by the user enabling the memory" refers to the capabilities of the input device to cause the memory to retain a visual data image. (Dkt. No. 231 at 4.) The Court disagrees that this is consistent with a plain reading of the claims. Plaintiff's interpretation would require the Court to redraft the claims and read the words "operation of the input device by the user" out of the claims. This would be improper. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362 (Fed. Cir. 2008) ("[C]ourts may not redraft claims, whether to make them operable or to sustain their validity.").

Indeed, the surrounding claim language contradicts Plaintiff's interpretation because it indicates that the patentee understood how to draft claim language that referred to the capabilities of an element. For example, claim 1 of the '168 Patent recites an "image collection device *being operable to* provide visual image data," a "display *being operable to* display for viewing by a user a perceptible visual image," a "memory *being suitable to* receive visual image data in digital format," an "input device *being operable by* the user," and a "media *being suitable to* embody at least one compression algorithm." '168 Patent at 15:17–34 (emphasis added). In contrast to this capability language, claim 1 also explicitly recites "operation of the input device

by the user," which under any plain reading of the claims requires action by a user.[3]

Accordingly, like the claim language at issue in *IPXL,* the language used in the independent claims of the '168 Patent is directed to user actions, not system capabilities. Thus, the claims improperly mix an apparatus and a method of using the apparatus. Consistent with the court's holding in *IPXL*, the independent claims are not definite as to whether the claim is infringed when the apparatus is made or sold, or when a user actually operates the input device. *IPXL*, 430 F.3d at 1384. Consequently, the Court finds that the independent claims, and the respective dependent claims, are indefinite under 35 U.S.C. § 112, ¶ 2.

Plaintiff also argues that the phrases, "movement by the user of the portable housing commonly moving the image collection device" and "movement by the user of the portable housing commonly moving the display," refer to the physical characteristic that the image collection device and display move contemporaneously with the portable housing. (Dkt. No. 231 at 4.) Again, Plaintiff's interpretation of the claim language would require the Court to read the words "movement by the user" out of the claims. However, these are the words chosen by the patentee, and their plain meaning creates confusion as to whether the claim is infringed when the apparatus is made or sold, or when a user actually moves the apparatus. *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) ("[I]n accord with our settled practice we construe the claim as written, not as the patentees wish they had written it.").

Indeed, claim 6 of the '871 Patent includes language that illustrates the difference between the plain language of these claims and Plaintiff's contention. Claim 6 of the '871 Patent recites "the cellular telephone and the integrated electronic camera *being movable in* common

---

[3] During the *Markman* hearing, Plaintiff also argued that the phrase "the input device being operable by the user," provided antecedent basis for the phrase "operation of the input device by the user." The Court is not persuaded that Plaintiff's antecedent basis argument changes the plain reading of the claim, which explicitly requires "operation of the input device by the user."

with the housing." '871 Patent at 15:41–43 (emphasis added). In contrast, claim 1 of the '168 Patent recites "movement *by the user* of the portable housing commonly moving the image collection device." '168 Patent at 15:47–48 (emphasis added). Accordingly, the claims fall within the rationale of *IPXL* and are indefinite.

### 2. Court's Construction

In light of the intrinsic evidence, the Court finds that the independent claims improperly mix an apparatus and a method, and are not definite as to when the claim is infringed. Accordingly, independent claims 1, 22, 24, 26, 27, and 29, and their dependents claims 2-21, 23, 25, and 28 in the '168 Patent, are indefinite under 35 U.S.C. § 112 ¶ 2.

### B. "setup"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"setup"** | Not Indefinite | Indefinite |

The parties dispute whether the term "setup" in the '871 Patent has a very specific meaning in relation to camera technology. Defendants contend that "setup" refers to the execution of special microprocessor-controlled patterns by means of a diascope projector included in the lens of a triaxial-code video camera. (Dkt. No. 224 at 11) (citing Dkt. No. 224-3 at 4 (*Broadcast Production Equipment, Systems and Services*, in Television Engineering Handbook, §14.97)). Defendants argue that there is no indication that "setup" was or could be used by any of the devices disclosed in the specification, because it relates to conventional analog and digital cameras and a camcorder. (Dkt. No. 224 at 11.) Defendants further argue that none of the cameras disclosed in the specification are triaxial cable video cameras, and therefore none could use "setup" as the claim term is understood in its proper context. (Dkt. No. 224 at 11.) According to Defendants, the term is meaningless and indefinite. (Dkt. No. 224 at 11.)

Plaintiff responds that Defendants attach a highly technical and narrow meaning to the

term "setup" for the sole purpose of manufacturing an indefiniteness argument. (Dkt. No. 231 at 5.) Plaintiff argues that Defendants' construction of "setup" ignores the specification and the dictionary definition of this term as it relates to cameras. (Dkt. No. 231 at 5) (citing '871 Patent, 13:46–52). Plaintiff contends that the specification indicates that digital commands are converted to analog signals for controlling features/functions of the camera (*e.g.*, setup). (Dkt. No. 231 at 5.) Plaintiff further argues that the term "setup" as it relates to cameras is "a camera position from which a scene is filmed." (Dkt. No. 231 at 5) (citing Dkt. No. 231-1 at 2 (Merriam-Webster Dictionary)). Plaintiff contends that all of the claims that recite "setup" are merely discussing control of the position of the camera from a device. (Dkt. No. 231 at 5.) According to Plaintiff, controlling the position of the camera is a functionality applicable to all cameras, including digital and analog cameras. (Dkt. No. 231 at 5.)

For the following reasons, the Court finds that the term **"setup"** is not indefinite.

### 1. Analysis

The term "setup" appears in claims 9 and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court also finds that the intrinsic evidence indicates that "setup" relates to one of the many controllable features/function of the camera. Claim 9 recites "digital/analog circuits for convening digital commands to analog signals for controlling gain, pedestal, setup, white clip, lens focus, white balance, lens iris, lens zoom and other functions of the camera." Thus, the claim language indicates that "setup" is one of the many controllable features/functions of the camera. Likewise, the specification states the following:

> Where desired, a system according to the embodiments also includes camera operation control capability through the use of a digital/analog network for converting digital commands to analog signals for controlling the gain, pedestal, setup, white clip, lens focus, and other functions of the camera from a local input device, a remote device or as programmed functions.

'871 Patent, 13:46–52 (emphasis added). Like the claims, this portion of the specification indicates that digital commands may be converted to analog signals for controlling features/functions of the camera (*e.g.*, setup).

Moreover, the extrinsic evidence cited by Defendants confirms that a person of ordinary skill would understand that "setup" relates to one of the many controllable features/function of the camera. Specifically, this extrinsic evidence discusses "digital setup" in the context of a triaxial-cable camera. (Dkt. No. 224-3 at 4.) Although this reference refers to the execution of special microprocessor-controlled patterns by means of a diascope projector included in the lens of a triaxial-code video camera, Defendants ignore that the reference also more generally refers to using digital-to-analog converters to "set up" the camera. (Dkt. No. 224-3 at 4) ("[S]uitable software could be used to set up the camera without human intervention."). This is exactly what is claimed, "digital/analog circuits for converting digital commands to analog signals for controlling … setup … and other functions of the camera." Thus, the Court agrees with Plaintiff that the term is not indefinite. Accordingly, the Court finds that the claims, viewed in light of the specification, inform those skilled in the art about the scope of the invention with reasonable certainty.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court finds that the term **"setup"** is not indefinite, and will be given its plain and ordinary meaning.

### C. *"the portable housing being wireless"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"the portable housing being wireless"** | Not Indefinite | Indefinite |

The parties dispute whether the phrase "the portable housing being wireless" in the '168 Patent is indefinite. Defendants contend that the specification provides no guidance for the

disputed phrase. (Dkt. No. 224 at 11.) Defendants argue that the phrase is subject to multiple potential interpretations, and that the specification provides no guidance to distinguish between their proposed interpretations of the phrase. (Dkt. No. 224 at 10-11.) Defendants further argue that the term "wireless" is specific to the communication capabilities of a device, but is never used in connection with the structural features (*e.g.* "portable") of the housing. (Dkt. No. 224 at 12.) Defendants also contend that components other than the housing itself must enable wireless transmission, and the housing would be no different in an embodiment lacking these components. (Dkt. No. 224 at 12.)

Plaintiff responds that when this phrase is read in its proper context, only one reasonable interpretation exists. (Dkt. No. 231 at 6.) Plaintiff argues that claim 1 of the '168 Patent recites both "the portable housing being wireless," and "a mobile phone supported by the portable housing, the mobile phone being operable to send to a remote recipient a wireless transmission." (Dkt. No. 231 at 6.) Plaintiff further contends that the specification states that "[t]he system of the present invention also contemplates wireless transmission over a cellular telephone, radio frequency, satellite transmission or the like." (Dkt. No. 231 at 6) (quoting '168 Patent at 10:22–26). According to Plaintiff, the only reasonable interpretation of this phrase is that the portable housing contains/supports a component that provides wireless transmission capability. (Dkt. No. 231 at 6.)

For the following reasons, the Court finds that the phrase **"the portable housing being wireless"** should be construed to mean **"the portable housing contains a component that provides wireless transmission."**

### 1. Analysis

The phrase "the portable housing being wireless" appears in claims 1, 22, 24, 26, 27, and 29 of the '168 Patent. The Court finds that the phrase is used consistently in the claims and is

intended to have the same meaning in each claim. The Court also finds that the intrinsic evidence indicates that "the portable housing being wireless" means that the portable housing contains a component that provides wireless transmission. In addition to reciting the disputed phrase "the portable housing being wireless," the claims also generally recite "a mobile phone supported by the portable housing, the mobile phone being operable to send to a remote recipient a wireless transmission." Thus, the claim language indicates that the portable housing contains a component (*e.g.*, a mobile phone) that provides wireless transmission.

Likewise, the specification states that "where desired, an integral cellular phone can be incorporated in the camera housing and transmission can be sent directly from the camera housing to a remote receiving station." '168 Patent at 12:1–5. The specification also states that "[t]he system of the present invention also contemplates wireless transmission over a cellular telephone, radio frequency, satellite transmission or the like." '168 Patent at 10:22–24. Thus, the specification indicates that the portable housing contains a component (*e.g.*, a mobile phone) that provides wireless transmission.

Defendants' contention that the phrase is subject to multiple potential interpretations ignores the intrinsic evidence and evaluates the phrase in a vacuum. *Demarini Sports v. Worth*, 239 F.3d 1314, 1327 (Fed. Cir. 2001) ("We note that claim terms are not construed in a vacuum. Rather, to interpret claim terms we look to all of the intrinsic evidence as it pertains to the terms in question."). Accordingly, the Court finds that the claims, viewed in light of the intrinsic evidence, inform those skilled in the art about the scope of the invention with reasonable certainty, and are not indefinite.

### 2. Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"the portable housing**

**being wireless"** to mean **"the portable housing contains a component that provides wireless transmission."**

### D. *"adapted for transmitting"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"adapted for transmitting"** | Not Indefinite | Indefinite |

The parties dispute whether the phrase "adapted for transmitting" in the '871 Patent is indefinite. Defendants contend that each of the wireless communication devices incorporated in the handheld device incorporate wireless transmission of digital signals. (Dkt. No. 224 at 12.) Defendants argue that the phrase "adapted for transmitting" requires that the structure of the communication device be modified (*i.e.*, "adapted") to transmit digitized signals. (Dkt. No. 224 at 12.) According to Defendants, the plain language of the phrase seeks to structurally modify a device component that already has the very function that is the subject of the adaptation. (Dkt. No. 224 at 13.) Defendants argue that this means that there is no context for what "adapted" refers to other than an existing function, and there is no basis on which to identify a boundary for the meaning of the phrase. (Dkt. No. 224 at 13.)

Plaintiff responds that the patentee used the phrase "adapted" synonymously with "made" throughout the '871 Patent. (Dkt. No. 231 at 6) (citing '871 Patent at 11:3–6). Plaintiff also argues that the patentee's usage of the term "adapt" is consistent with the dictionary definition. (Dkt. No. 231 at 7) (citing Dkt. No. 231-1 at 5 ((Merriam-Webster Dictionary) (defining "adapt" as "to make fit (as for a new use) often by modification."))). Finally, Plaintiff argues that while "adapted" may commonly be associated with modifications of a device, it can also refer to how the device was originally made to fit or work. (Dkt. No. 231 at 7.)

For the following reasons, the Court finds that the phrase **"adapted for transmitting"** is not indefinite.

### 1. Analysis

The phrase "adapted for transmitting" appears in claim 1 of the '871 Patent. Specifically, claim 1 recites "a wireless communications device adapted for transmitting any of the digitized signals to the compatible remote receiving station." The Court finds that this claim language is not confusing or ambiguous. Furthermore, the Court is not persuaded by Defendants' argument that the phrase seeks to structurally modify a device component that already has the very function that is the subject of the adaptation. (Dkt. No. 224 at 13.) Instead, the claim language plainly states that the wireless communications device is "adapted for transmitting any of the digitized signals to the compatible remote receiving station." In other words, if the wireless communication device can transmit the digitized signal, then it is "adapted" within the scope of the claims. If it cannot transmit the digitized signal, then it is not "adapted" within the scope of the claims. Accordingly, the Court finds that the claims, viewed in light of the intrinsic evidence, inform those skilled in the art about the scope of the invention with reasonable certainty, and are not indefinite. Furthermore, the Court finds that the phrase "adapted for transmitting" is unambiguous, is easily understandable by a jury, and requires no construction.

### 2. Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase **"adapted for transmitting"** is not indefinite, and will be given its plain and ordinary meaning.

## E. "processor" phrases

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"a processor in the housing for generating an image data signal representing the image framed by the camera"** | Not a means-plus-function claim; no construction necessary.<br><br>**<u>Alternatively</u>**<br>**Function:** generating an image data signal representing the image framed by the camera<br>**Structure:** A processor associated with the electronic camera. The processor executes the algorithm of detecting the initiation of a camera and capture sequence, initiating capture of an image frame and storing the digital image frame in a digital memory device. | **Function:** generating an image data signal representing the image framed by the camera.<br>**Structure**: A general purpose processor having a memory for storing the software program executed by the processor. The processor executes the algorithm of: receiving a signal from an image sensor and transmitting a captured image to a gray scale bit map memory device, outputting the image to a half-tone conversion scheme to be input into a binary bit map for formatting the captured image in a configuration suitable for transmission via a Group III facsimile system or PC modem protocol. |
| **"a processor associated with the electronic camera for capturing and digitizing the framed image in a format for transmission over the cellular telephone network via the cellular telephone"** | Not a means-plus-function claim; no construction necessary.<br><br>**<u>Alternatively</u>**<br>**Function:** capturing and digitizing the framed image in a format for transmission over the cellular telephone network via the cellular telephone.<br>**Structure**: A processor associated with the electronic camera. The processor executes the algorithm of detecting the initiation of a camera and capture sequence, initiating capture of an image frame and storing the digital image frame in a digital memory device in a format for transmission over a cellular network. | **Function:** capturing and digitizing the framed image in a format for transmission over the cellular telephone network via the cellular telephone.<br>**Structure:** A dedicated image processor having a control store memory for storing the software program executed by the processor The processor executes the software algorithm of: detecting the initiation of a camera and capture sequence, initiating capture of an image frame, transmitting the captured image to a gray scale bit map memory device, outputting the image to a halftone conversion scheme to be input into a binary bit map for formatting the captured image in a configuration suitable for transmission via a Group-III facsimile system or a PC modem protocol. |

| "a processor for processing the image framed by the camera for generating a digitized framed image as displayed in the display" | Not a means-plus-function claim; no construction necessary. **Alternatively** **Function:** processing the image framed by the camera for generating a digitized framed image as displayed in the display **Structure:** A processor associated with the electronic camera. The processor executes the algorithm or converting the signal for display and stores it in a digital memory device | **Function:** Processing the image framed by the camera for generating a digitized framed image as displayed in the display. **Structure:** A microprocessor or digital image processor having a control store memory for storing the software program executed by the processor. The processor executes the algorithm of: Transmitting the captured image to a gray scale bit map memory device, inputting the output of the gray scale bit map to a digital memory device, recalling the image from the digital memory device, and outputting the image to the display |
|---|---|---|

The parties dispute whether the "processor" phrases in the '871 Patent invoke 35 U.S.C. § 112, ¶ 6, and require construction. Plaintiff argues that none of these claim phrases contain the word "means," and thus the Court must presume that the limitation does not invoke § 112, ¶ 6. (Dkt. No. 216 at 26.) Plaintiff further contends that Defendants cannot meet their burden of rebutting the presumption because the structure for the three phrases is "a processor." (Dkt. No. 216 at 26.) (citing *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004)). Plaintiff also argues that in *Ex Parte Cutlip,* 2014 WL 2466586 (P.T.A.B. May 29, 2014), the PTAB found that "the claimed processor and memory very clearly refer to structural elements which Appellant's Specification discloses are used to implement the functionality recited by the claimed modules." (Dkt. No. 216 at 28) (quoting *Id*. at *2–3). Plaintiff argues that the PTAB cited to the specific part of the specification that indicated that the processor was a hardware device and not merely software. (Dkt. No. 216 at 28.) Plaintiff contends that similar to *Ex Parte Cutlip*, the intrinsic evidence indicates that the processor is a hardware device and not merely software. (Dkt. No. 216 at 28) (citing '871 Patent at 8:25–32; Figures 5 and 8A-5).

In the alternative, Plaintiff proposes constructions that include corresponding structure.

(Dkt. No. 216 at 30-31, 32-33, 34.) Plaintiff argues that its proposed constructions identify the structure actually necessary to perform the function. (Dkt. No. 216 at 31, 33, 35.) Plaintiff contends that Defendants' constructions include numerous ancillary implementation details unnecessary to performance of the function. (Dkt. No. 216 at 31, 33, 35.) Plaintiff also contends that Defendants' constructions improperly exclude particular embodiments. (Dkt. No. 216 at 32, 33.) Plaintiff further argues that Defendants' corresponding structures are incorrect because neither the specification nor the prosecution history clearly link or associate the proposed structures to the function recited in the claim. (Dkt. No. 216 at 31, 34, 35.)

Defendants respond that the "processor" terms all recite purely functional limitations of a processor. (Dkt. No. 224 at 25.) Defendants argue that a general-purpose processor is incapable of performing the recited functions unless programmed with an algorithm. (Dkt. No. 224 at 25.) Defendants argue that a claim must connote sufficient structure to one of skill in the art to perform the function identified by each limitation to avoid being construed under § 112, ¶ 6. (Dkt. No. 224 at 25) (citing *Robert Bosch, LLC v. Snap-On, Inc.*, No. 2014-1040, 2014 WL 5137569, at *2 (Fed. Cir. Oct. 14, 2014).

Defendants further argue that a court in this District found that "[i]f 'computer' or 'processor' is insufficient structure to define the scope of a means-plus-function limitation, the word 'processor' cannot describe sufficient structure when recited directly in a claim limitation itself." (Dkt. No. 224 at 26) (citing *Personal Audio, LLC v. Apple, Inc.,* No. 9:09-cv-111, 2011 WL 11757163, at *21 (E.D. Tex. Jan. 31, 2011)). Defendants also contend that the PTO (through the PTAB) has consistently held that claims reciting a "processor" for performing a specialized function invoke § 112, ¶ 6. (Dkt. No. 224 at 26.)

Defendants further contend that the specification of the '871 Patent admits that the

processor requires a "software program executed by the processor" in order to perform the specified functions. (Dkt. No. 224 at 27) (citing '871 Patent at 8:29–38). According to Defendants, the phrases should be interpreted as means-plus-function elements, because they "recite[…] function without reciting sufficient structure for performing that function." (Dkt. No. 224 at 27) (quoting *Robert Bosch,* 2014 WL 5137569, at *2).

Defendants argue that Plaintiff incorrectly relies on cursory statements to support its argument that Defendants' construction excludes embodiments. (Dkt. No. 224 at 29.) Defendants argue that "[a] bare statement that known techniques or methods can be used does not disclose structure." (Dkt. No. 224 at 29) (quoting *Biomedino, LLC v. Waters Technologies Corp*., 490 F.3d 946, 953 (Fed. Cir. 2007)). Defendants further argue that a disclosure that only suggests a possible alternative embodiment without sufficiently describing that embodiment should not be treated as corresponding structure. (Dkt. No. 224 at 29) (citing *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1551–52 (Fed. Cir. 1997)). Defendants also contend that Plaintiff's construction simply repeats the functions and that their construction is consistent with the specification. (Dkt. No. 224 at 29, 30, 31.)

Plaintiff replies that Defendants completely ignore the "strong" presumption that the absence of the word "means" indicates that § 112, ¶ 6 is not invoked. (Dkt. No. 231 at 10) (citing *Williamson v. Citrix Online, LLC*, 770 F.3d 1371 (Fed. Cir. 2014)). Plaintiff argues that Defendants' reliance on *Bosch* is misplaced because the phrases at issue there were "program loading device" and "program recognition device." (Dkt. No. 231 at 10-11) (citing *Robert Bosch*, 769 F.3d at 1099). Plaintiff argues that the Federal Circuit had previously found "device" to be a nonstructural, "nonce" word and applied that holding. (Dkt. No. 231 at 10-11.) According to Plaintiff, *Bosch* did not change the legal landscape, it merely applied longstanding law. (Dkt. No.

231 at 11.)

Plaintiff further argues that the term "processor" in the disputed phrases denotes structure to a person of ordinary skill. (Dkt. No. 231 at 11) (citing *Ex Parte Cutlip*, 2014 WL 2466586, at *2-3 (P.T.A.B. May 29, 2014) ("[T]he claimed processor and memory very clearly refer to structural elements which Appellant's Specification discloses are used to implement the functionality recited by the claimed modules").  Finally, Plaintiff argues that Defendants' construction overlook swaths of the specification in favor of a single embodiment. (Dkt. No. 231 at 11-12.)

For the following reasons, the Court finds that Defendants have failed to overcome the rebuttable presumption that the "processor" phrases do not invoke  35 U.S.C. § 112, ¶ 6, and that the phrases should be given their plain and ordinary meaning.

## 1. Analysis

The phrase "a processor in the housing for generating an image data signal representing the image framed by the camera" appears in claim 1 of the '871 Patent.  The phrase "a processor associated with the electronic camera for capturing and digitizing the framed image in a format for transmission over the cellular telephone network via the cellular telephone" appears in claim 6 of the '871 Patent.  The phrase "a processor for processing the image framed by the camera for generating a digitized framed image as displayed in the display" appears in claims 9 and 12 of the '871 Patent.

The Court first notes that none of the disputed phrase recite "means."  It is well established that "[a] claim limitation that actually uses the word 'means' will invoke a rebuttable presumption that § 112 ¶ 6 applies.  By contrast, a claim term that does not use 'means' will trigger the rebuttable presumption that § 112 ¶ 6 does not apply." *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1369 (Fed. Cir. 2002) (internal citation omitted).  The Federal Circuit has

"repeatedly characterized this presumption as 'strong' and 'not readily overcome' and, as such, ha[s] 'seldom' held that a limitation without recitation of 'means' is a means-plus-function limitation." *Apple, Inc. v. Motorola, Inc.,* 757 F3d 1286, 1297 (Fed. Cir. 2014). Because none of the disputed limitations include the word "means," Defendants have the burden of overcoming the presumption by demonstrating that the claims fail to "recite sufficiently definite structure" or recite a "function without reciting sufficient structure for performing that function." *Watts v. XL Sys., Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000). The Court finds that Defendants have failed to meet their burden.

Defendants skip the step of determining whether the limitation read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art. *Apple,* 757 F3d at 1298 ("The correct inquiry, when 'means' is absent from a limitation, is whether the limitation read in light of the remaining claim language, specification, prosecution history, and relevant extrinsic evidence, has sufficiently definite structure to a person of ordinary skill in the art."). The Federal Circuit has held that terms such as "detector" and "circuit" are structural terms while generic terms such as "means," "element," and "device" are nonstructural. *Apple*, 757 F.3d at 1299 (citing *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n,* 161 F.3d 696, 705 (Fed. Cir. 1998); *Apex Inc. v. Raritan Computer, Inc.,* 325 F.3d 1364, 1373 (Fed. Cir. 2003)). Like "circuit" in *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004), the recited "processor" is a structure-connoting term. *Id.* at 1320. In other words, "processor" is not a generic nonstructural term such as "means," "element," and "device" that typically do not connote sufficient structure. *Apple*, 757 F.3d at 1299-1300. Moreover, even if a term covers a broad class of structures and identifies structures by their function, it is sufficient to avoid means-plus-function treatment.

*Lighting World*, 382 F.3d at 1360. What is important is whether the term is understood to describe structure and is not simply a substitute for "means for." *Id.*

Here the specification indicates to a person of ordinary skill in the art that the recited "processor" is sufficiently definite structure, and not merely software. For example, the specification states that:

> In the exemplary embodiment, the processor 86 can be any processor such as a microprocessor or DSP, with sufficient capability to perform the described functions. The processor bus is indicated at 87. The circuitry supporting the processor comprises the processor chip 86 and the control store memory (ROM, Flash RAM, PROM, EPROM or the like) 92 for storing the software program executed by the processor.

'871 Patent, 8:25–32. As the Federal Circuit stated in *Apple*, "structure may also be provided by describing the claim limitation's operation such as its input, output, or connections." *Apple*, 757 F.3d at 1300. Here, Figures 5, 8A-3, and 8A-5 illustrate the recited processor as a hardware component in the schematic circuit diagrams. The specification further describes and illustrates the processor's connection to other components:

> FIG. 8 is an illustration of an exemplary schematic diagram for the circuit of a system according to embodiments as specifically taught in the diagram of FIG. 5. Pin numbers, wiring harnesses and components are as shown on the drawing. FIG. 8, part A, is the system interconnect and shows the central processor board 300, the video board 302, the power board 304 and the CRT electronic interconnect board 306.

'871 Patent at 11:21–28. In light of the intrinsic evidence, the Court finds that Defendants have failed to overcome the strong presumption that § 112, ¶ 6 does not apply to the "processor" claim limitations, none of which include the term "means." Moreover, the Court finds that the "processor" phrases are unambiguous, are easily understandable by a jury, and require no construction.

The Court further finds that the cases cited by Defendants are not applicable to the facts of this case. First, in *Aristocrat Techs. Austl. Pty v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed.

Cir. 2008) and *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1348-49 (Fed. Cir. 1999), the asserted claims included the term "means," and there were no disputes that means-plus-function claim construction applied. Thus, neither case analyzed the presumption against the applicability of § 112, ¶ 6 where a claim does not recite "means." Similarly, *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094 (Fed. Cir. 2014) is distinguishable because it involved claims reciting "device," a term that the Federal Circuit explicitly recognizes as a non-structural "nonce" word. *See also Apple*, 757 F.3d at 1299-1300. Thus, *Bosch's* analysis differs significantly from this case, where "processor" connotes at least some structure, and does not affect the Court's outcome.

Finally, the reasoning in *Personal Audio,* 2011 U.S. Dist. LEXIS 157778, relied heavily on *Aristocrat. Id.* at 8-10. Since *Personal Audio*, the Federal Circuit clarified that "where the claim is not drafted in means-plus-function format, the reasoning in the *Aristocrat* line of cases does not automatically apply, and an algorithm is not necessarily required." *Apple*, 757 F.3d at 1298. The *Aristocrat* reasoning applies where a patentee has expressly invoked means-plus-function claiming to determine whether the patentee has disclosed sufficient structure to define the scope of such a claim. Accordingly, the analysis of recited structure in *Personal Audio* differs from the Federal Circuit's guidance in *Apple.*

Moreover, *Personal Audio* differs further from this case. In *Personal Audio*, both asserted patents shared a common specification and nearly identical claims were at issue. *Personal Audio*, 2011 U.S. Dist. LEXIS 157778, at *1-2. The second-issued patent was a divisional of the first-issued patent. *Id.* The court noted that "[t]he claim terms at issue in the [second-issued] patent are nearly identical to the means-plus-function terms found in the [first-issued] patent, except that 'means for' and 'means responsive' have been replaced with "processor for" and "said processor

responds." 2011 U.S. Dist. LEXIS 157778, at *69. Accordingly, there was support for finding that the "processer" terms did not describe structure and were simply a substitute for "means for," which overcame the presumption. In this case, "processor" has not simply replaced "means" in otherwise identical claim language between asserted patents. Therefore, the Court finds that *Personal Audio* is less persuasive in this situation.

## 2. Court's Construction

In light of the intrinsic evidence, the Court finds that Defendants failed to overcome the presumption against treating the "processor" limitations as means-plus-function claims. Accordingly, the phrase **"a processor in the housing for generating an image data signal representing the image framed by the camera,"** the phrase **"a processor associated with the electronic camera for capturing and digitizing the framed image in a format for transmission over the cellular telephone network via the cellular telephone,"** and the phrase **"a processor for processing the image framed by the camera for generating a digitized framed image as displayed in the display"** will be given their plain and ordinary meaning.

### F. "manually portable housing," "handheld," and "portable housing"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"manually portable housing"** | a housing small enough to be held and operated while holding it in one hand | housing (defined as "an enclosing structure") capable of being held by hand |
| **"handheld"** | a portable device small enough to be held and operated while holding it in one hand | capable of being held by hand |
| **"portable housing"** | a housing small enough to be held and operated while holding it in one hand | housing (defined as "an enclosing structure") capable of being held by hand |

The parties agree that "housing" should be construed as "an enclosing structure." (Dkt. No. 241 at 10, 12.) The parties dispute whether the terms "manually portable housing" and "handheld" in the '871 Patent, and "portable housing" in the '168 Patent should be construed as

"small enough to be held and operated while holding it in one hand," as Plaintiff proposes. Plaintiff contends that Defendants' construction provides an improper and practically boundless scope of what is manually portable. (Dkt. No. 216 at 8.) Plaintiff argues that Defendants' construction could include "items as large as a server or a dresser of drawers." (Dkt. No. 216 at 8.) Plaintiff further argues that the specification teaches a device much smaller than Defendants' construction. (Dkt. No. 216 at 8) (citing '871 Patent at 5:18–21). Plaintiff contends that the specification equates "portable" to "handheld." (Dkt. No. 216 at 8) ('871 Patent at 10:26–30). Plaintiff also contends that Figures 6B, 7A, and 7B are consistent with its construction. (Dkt. No. 216 at 8.) Finally, Plaintiff argues that its construction is further confirmed by multiple dictionary definitions for "handheld." (Dkt. No. 216 at 9.)

Defendants argue that the terms "hand held" and "portable" will be readily understood by the jury, and nothing in the specification suggests that the patentee acted as his own lexicographer to give these terms a narrower meaning. (Dkt. No. 224 at 13.) Defendants contend that the patents merely distinguish stationary desktop units that are not capable of being held by hand from portable units. (Dkt. No. 224 at 14) (citing '871 Patent at 5:18–21; 10:26–28). Defendants also argue that depending on the circumstances and the user, the cameras illustrated in Figures 6B and 7A may require both hands to hold and operate. (Dkt. No. 224 at 14.) Defendants contend that Plaintiff's construction that requires a device to be held in one hand, and operated with the other, is confusing and has no support in the specification. (Dkt. No. 224 at 14.) Finally, Defendants argue that other courts in this district have declined to import operability limitations into similar terms where it was not clearly required by the specification. (Dkt. No. 224 at 14.)

For the following reasons, the Court finds that the terms **"manually portable housing"**

and **"portable housing"** should be construed as **"housing capable of being held by hand."** The Court further finds that **"handheld"** should be construed as **"capable of being held by hand."**

### 1. Analysis

The term "manually portable housing" appears in claims 1 and 6 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "handheld" appears in claims 1, 6-9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "portable housing" appears in claims 1, 3, 4, 7, 9, 19, 21, 22, 24, 26, 27, and 29 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.

Plaintiff proposes that the terms should be construed as "small enough to be held and operated while holding it in one hand." The Court finds that neither the claims, nor the specification include the narrow and potentially confusing construction that Plaintiff proposes. The specification does distinguish stationary desktop units that are not capable of being held by hand from portable units. Specifically, the specification states "[b]oth portable, or hand held, image capture and transmission units and stationary, or desktop, image capture and transmission units are described." '871 Patent at 5:18–21. However, this description does not indicate that the terms should be construed as "small enough to be held and operated while holding it in one hand." Instead, it indicates that the terms should be construed as capable of being held by hand, as Defendants propose. There is no requirement that the user use only one hand to operate the claimed apparatus. Moreover, common experience indicates that the 35 millimeter type camera housing illustrated in Figures 7A and 7B may require two hands to operate. Plaintiff's construction not only adds unnecessary ambiguity, but is inconsistent with how a person of

ordinary skill in the art would understand the terms in light of the intrinsic evidence.

## 2. Court's Construction

In light of the intrinsic evidence, the Court construes the terms **"manually portable housing"** and **"portable housing"** as **"housing capable of being held by hand."** The Court also construes the term **"handheld"** as **"capable of being held by hand."**

### G. *"supported/supporting/supports"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"supported/supporting/ supports"** | No construction necessary<br><br>Alternative: Hold in place through direct or indirect contact with | Hold in place through contact with |

The parties dispute whether the terms "supported/supporting/supports" require "direct" contact, as Defendants propose. Plaintiff argues that Defendants' construction is ambiguous because it fails to address whether such contact could be direct or indirect. (Dkt. No. 216 at 10.) Plaintiff contends that to the extent that Defendants' construction is limited to direct "contact with" what is being held in place, Defendants' construction is improperly limiting. (Dkt. No. 216 at 10.) In the alternative, Plaintiff proposes construing the term as "hold in place through direct or indirect contact with."

Defendants respond that these terms are susceptible to two ordinary meanings: (1) to bear the weight of or (2) to hold in place through contact. (Dkt. No. 224 at 14) (citing Dkt. No. 224-4 at 3 (American Heritage Dictionary at 1364)). Defendants argue that only the latter meaning is supported by the Asserted Patents. (Dkt. No. 224 at 14.) Defendants contend that the claims cover the physical configuration of components in relationship to a housing of a device having integrated camera and telephone functionality. (Dkt. No. 224 at 15.) Defendants also argue that Figure 7A and accompanying text shows that the button keys (98), the LCD unit,

viewfinder (194), back window (198), and memory card (72) are all held in place through contact with the housing. (Dkt. No. 224 at 15) (citing '871 Patent at 11:8–14). According to Defendants, the plain language of the claims demonstrate that the term "support" should be construed as held in place through contact, as Defendants propose. (Dkt. No. 224 at 15.)

For the following reasons, the Court finds that the terms **"supported/supporting/supports"** should be given their plain and ordinary meaning.

### 1. Analysis

The terms "supported/supporting/supports" appear in claims 1, 6, and 12 of the '871 Patent, and claims 1, 4, 7, 9, 19, 20, 21, 22, 24, 26, 27, and 29 of the '168 Patent. The Court finds that the terms are used consistently in the claims and are intended to generally have the same meaning in each claim. The Court also finds that the terms are unambiguous, are easily understandable by a jury, and require no construction. The claim language plainly states a variety of components such as the "input keys," "media," "image collection device", and "digital camera," are "supported by the housing." This language is not confusing and does not require construction.

Defendants contend that this language requires direct contact, and excludes indirect contact between a components and the housing. (Dkt. No. 224 at 15 n.9.) Defendants point to one embodiment to support their construction. (Dkt. No. 224 at 15.) However, the claims are not limited to a disclosed embodiment, and there is nothing that prevents indirect contact between a component and the housing. Indeed, the extrinsic evidence submitted by Defendants indicates that "support" can mean direct or indirect contact. (Dkt. No. 224-4 at 3 (American Heritage Dictionary at 1364)). To the extent that a party contends that plain and ordinary meaning of "supported/supporting/supports" requires direct contact and excludes indirect contact, the Court rejects this argument because it is inconsistent with how a person of ordinary skill would

interpret the claims.

## 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the terms **"supported/supporting/supports"** will be given their plain and ordinary meaning.

### H. *"self-contained"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"self-contained"** | A unitary system incorporating a combination cellular telephone, integrated image processing system, display, camera and integral power unit (such as a rechargeable battery source or the like) | No construction necessary. |

The parties dispute whether the term "self-contained" in the '871 Patent requires construction. Plaintiff argues that the term "self-contained" should be construed because it can mean different things in different contexts. (Dkt. No. 216 at 10.) Plaintiff contends that its construction is adapted from the specification, which states that the invention is "self-contained with an integral power unit such as a rechargeable battery source or the like." (Dkt. No. 216 at 10) (citing '871 Patent at 2:55–59; 13:33–35). Plaintiff further argues that its construction contains the elements recited in claim 1. (Dkt. No. 216 at 11-12.)

Defendants respond that the claims recite specific combinations of elements in a housing (*e.g.*, "an electronic camera contained within the portable housing," "a processor in the housing," and "a telephonic system in the housing"). (Dkt. No. 224 at 16.) Defendants contend that Plaintiff's construction renders these claim limitations superfluous. (Dkt. No. 224 at 16.) Defendants also argue that the various references to "self-contained" in the Asserted Patents are neither ambiguous, confusing, nor susceptible to multiple interpretations. (Dkt. No. 224 at 16.) Finally, Defendants argue that the preambles of the relevant claims are not limiting, and each of the relevant claims separately sets out the required elements of the alleged invention. (Dkt. No.

224 at 16.)

For the following reasons, the Court finds that the term **"self-contained"** should be given its plain and ordinary meaning.

### 1. Analysis

The term "self-contained" appears only in the preambles of claims 1-5 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court also finds that the term is unambiguous, is easily understandable by a jury, and requires no construction. In addition, the claim language itself recites the different elements that are required to be "self-contained" or "in the housing" in the body of the claim. Plaintiff's construction would render these claim limitations superfluous and is therefore rejected. That said, the Court finds that the preamble is limiting because it provides antecedent basis for the term "wireless telephone network." *Micron Tech., Inc. v. Tessera, Inc.*, 440 F. Supp. 2d 591, 597 (E.D. Tex. 2006) ("When limitations in the body of a patent claim rely upon, and derive antecedent basis from, the claim preamble, the preamble may act as a necessary component of the claimed invention."). However, as discussed, this finding does not require adoption Plaintiff's construction for "self-contained."

### 2. Court's Construction

In light of the intrinsic evidence, the term **"self-contained"** will be given its plain and ordinary meaning.

### I. *"input keys," "keypad," and "a set of input keys"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"input keys"** | a manually activated array of inputs | physical push-buttons |
| **"keypad"** | a logical grouping of input keys | array of physical push-buttons |

| **"a set of input keys"** | No construction necessary for entire phrase (but see "input keys" proposed construction) | a group of physical push-buttons |
|---|---|---|

The parties dispute whether the recited "input key" and "keypad" in the '871 Patent must be physical push-buttons, as Defendants propose. Plaintiff contends that there is no requirement that "input keys" be physical push-buttons. (Dkt. No. 216 at 11.) Plaintiff argues that the claims themselves describe the metes and bounds of "input keys" as alphanumeric, located in the housing, and for permitting manually input digitized alphanumeric signals. (Dkt. No. 216 at 11.) Plaintiff contends that its construction of "a manually activated array of inputs," is consistent with common usage of the term and the claims. (Dkt. No. 216 at 12) (citing Dkt. No. 216-4 at 6 (The Authoritative Dictionary of IEEE Standards Terms 7th Ed. at 600)).

Defendants respond that all of the relevant claims indicate that the input keys or keypad are not part of the display, because they recite both input keys or a keypad, and separately, a display. (Dkt. No. 224 at 17.) Defendants argue that all of the relevant claims require that the input keys be either in the housing or supported by the housing, indicating that they cannot merely be an image on a screen. (Dkt. No. 224 at 17) (citing '871 Patent at 17:9–11). Defendants argue that every embodiment described in the specification and shown in the drawings discloses the use of physical push-button keys. (Dkt. No. 224 at 18) (citing '871 Patent at 11:8–10, Figure 7A). Defendants contend that each and every portion of the specification referring to input keys or a keypad refers to them as a push button, "button interface," or a keyboard, not a portion of the display. (Dkt. No. 224 at 18) ('871 Patent at 12:41–46; 2:28–32; 12:60–65; 8:47–48). Defendants contend that the specification solely refers to physical keys, not virtual keys on a display. (Dkt. No. 224 at 19.) Defendants argue that dictionaries refer to a "key" or "keypad" as a push button or set of push buttons. (Dkt. No. 224 at 19.)

Plaintiff replies "virtual keys" are keys for inputting data, and a claim construction that

excludes "virtual keys" cannot be correct. (Dkt. No. 231 at 7.) Plaintiff further contends that Defendants' argument that the input keys must be distinct from the display is wrong. (Dkt. No. at 7.) Plaintiff argues that nothing in the claims requires this separation. (Dkt. No. 231 at 7.) Plaintiff further argues that the only requirement for the "input keys" is that they be in the housing. (Dkt. No. 231 at 7) (citing '871 Patent at 15:6).

For the following reasons, the Court finds that the term **"input keys"** should be construed as **"switches and/or buttons,"** and the phrase **"a set of input keys"** should be construed as **"a set of switches and/or buttons."** The Court also finds that the term **"keypad"** should be construed as **"array of switches and/or buttons."**

## 1. Analysis

The term "input keys" appears in claims 1, 9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The term "keypad" appears in claim 6 of the '871 Patent, and the phrase "a set of input keys" appears in claim 12 of the '871 Patent. The claim language indicates that the "input keys" are used to manually input alphanumeric signals. *See. e.g.,* Claim 1 ("alphanumeric input keys in the housing for permitting manually input digitized alphanumeric signals to be input to the processor."). The specification further indicates that a person of ordinary skill in the art would understand that specification describes the recited "input keys" as "buttons" and/or "switches." Specifically, the specification states "the bank of operator buttons and/or switches 98 are connected to the system through the button interface 100." '871 Patent at 8:47–48. Similarly, the specification states that "[t]he operator interface button keys 98 are housed within the housing and can be positioned on the back plate 196 of the body." '871 Patent at 11:8–10. Likewise, the specification states that "FIG. 8, part L shows the push button control switches as 490 and 492." '871 Patent at 12:41–42. Accordingly, the Court finds that Court finds that the term "input keys"

should be construed as "switches and/or buttons," and the phrase "a set of input keys" should be construed as "a set of switches and/or buttons." The Court also finds that the term "keypad" should be construed as "array of switches and/or buttons."

Contrary to Defendants' argument, the claim language does not require the "input keys" to be distinct from the display. For example, claim 1 of the '871 Patent recites "a display for displaying an image framed by the camera." Claim 1 further recites "input keys … for permitting manually input digitized alphanumeric signals to be input to the processor." Thus, the claim language specifies a purpose for both the display and the input keys. Neither of these purposes require the input keys to be distinct from the display. Moreover, the claims indicate that the display is supported by the housing and that the input keys are in the housing. Again, this does not require the input keys to be distinct from the display as input keys that are in the housing will also be supported by the housing.

Regarding Defendants' "physical" construction, the Court is not persuaded that the terms should be limited to the disclosed embodiments illustrating "physical" push-buttons. As discussed, the claim language recites that "input keys" permit the manual input of alphanumeric signals. The inputting of alphanumeric signals is not limited by the intrinsic evidence to "physical" push-button keys, as Defendants propose. *Electro Medical Sys., S.A. v. Cooper Life Sciences,* 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[A]lthough the specifications may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments."). Moreover, the Court finds that Defendants' construction that the "input keys" be "physical" does not necessarily exclude "virtual keys," as Defendants contend. Even "virtual keys" have a physical component because the user inputs the alphanumeric signals by physically touching the

virtual keys.

In effect, Defendants ask the Court to import a negative limitation into these constructions via a strained interpretation of "physical," which they contend excludes "virtual keys." Importing negative limitations into a claim absent an explicit disavowal is generally disfavored. *See Omega Eng'g. Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332-33 (Fed. Cir. 2003) (noting that a negative limitation imposed by the district found no anchor in the claim language, the plain and ordinary meaning of the phrase, or in any express disclaimer within the specification). Here, the claim term "input keys" is sufficiently broad to include different types of "buttons and/or switches." Nothing in the record suggests that the patentee disclaimed any particular type of "buttons and/or switches." To the extent that Defendants argue that input keys exclude "virtual keys," the Court rejects this argument.

Finally, at the *Markman* hearing, Defendants argued that the specification does not enable "virtual keys," because there is no indication that the patentee contemplated "virtual keys." Whether the claims enable "virtual keys" is a question that is not properly before the Court. The parties have not submitted evidence that a person of ordinary skill in the art would be unable to practice the claimed invention with "virtual keys." Notwithstanding, determining whether "virtual keys" are after-arising technology is not critical at this stage of the case because Federal Circuit precedent does not exclude after-arising technology from valid claims. *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371-1372 (Fed. Cir. 2008) ("Our case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.").

## 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term **"input keys"** as **"switches and/or buttons,"** and the phrase **"a set of input keys"** as **"a set of switches**

and/or buttons." The Court also construes the term **"keypad"** as **"array of switches and/or buttons."**

*J. "image data signal(s)" and "viewing incoming image data signals"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"image data signal(s)"** | No construction necessary<br><br>Alternatively, "one or more signals representing an image" | a modulated signal incorporating digital data representing an image |
| **"viewing incoming image data signals"** | viewing image data signals received from a source external to the device | Viewing incoming image data signals (as construed above) from a source external to the display |

The parties dispute whether the term "image data signal(s)" in the '871 Patent should be construed as "a modulated signal incorporating digital data representing an image," as Defendants propose. Plaintiff contends that no construction is necessary, and that Defendants' construction is incorrect for a number of reasons. (Dkt. No. 216 at 13.) Plaintiff first argues that Defendants' construction is unnecessary because it merely paraphrases the claim language. (Dkt. No. 216 at 13.) Plaintiff next argues that Defendants' construction imports the unwarranted limitations that the signal must be modulated and the data must be digital. (Dkt. No. 216 at 13.) Plaintiff argues that the word "modulate" does not appear in the claims or specification, and will only serve to introduce confusion because it is more technical than the underlying claim term it defines. (Dkt. No. 216 at 13.)

Regarding the phrase "viewing incoming image data signals" in the '871 Patent, Plaintiff argues that Defendants' construction makes little sense in the context of the claims and specification. (Dkt. No. 216 at 13.) Plaintiff argues that the specification uses the term "incoming" in terms of a signal received from a source external to the device. (Dkt. No. 216 at 13) (citing '871 Patent at 10:48–51; 3:14–20; 9:38–46; 9:58–60; 14:1–3). Plaintiff argues that in

one embodiment the incoming data comes through the cellular connection, which means the incoming data originates from a source external to the device. (Dkt. No. 216 at 13.)

Defendants respond that the only evidence of record demonstrates that this claim phrase refers to a specific type of signal, one having both a format and a protocol that may be transmitted external to the device itself. (Dkt. No. 224 at 19.) Defendants note that other than the claims, the phrase "image data signal" appears only two other places in the specification. (Dkt. No. 224 at 19.) Defendants contend that each of these references demonstrates that the "image data signal" is a specific signal that has a protocol and a format that is transmitted. (Dkt. No. 224 at 19-20) (citing '871 Patent at 9:17–30).

Defendants contend that it is clear from the specification that modem 104 transmits the image data signal, and therefore, the "image data signal" is an output of the modem. (Dkt. No. 224 at 20.) Defendants argue that the output of the modem is a modulated signal that can be transmitted out of the handheld device over a transmission media (such as a wireline or the air). (Dkt. No. 224 at 20.) According to Defendants, it is this modulated signal for transmission that the specification identifies as the "image data signal." (Dkt. No. 224 at 20.) Defendants further argue that none of the specification citations referenced by Plaintiff specifically refer to an "image data signal." (Dkt. No. 224 at 21.)

Plaintiff replies that Defendants correctly argue that "image data signal" is a specific type of signal, but that the specific type of signal is an image data signal, as described by the claims. (Dkt. No. 231 at 7-8.) Plaintiff argues that the modem described in the specification merely shows how image data signals can be transmitted in an embodiment. (Dkt. No. 231 at 8.)

For the following reasons, the Court finds that the term **"image data signal(s)"** should be given its plain and ordinary meaning. The Court further finds that the phrase **"viewing incoming**

**image data signals"** should be given its plain and ordinary meaning.

## 1. Analysis

The term "image data signal(s)" appears in claims 1, 4–6, 10, and 11 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The phrase "viewing incoming image data signals" appears in claim 5 of the '871 Patent. The Court finds that in the context of the surrounding claim language, the term "image data signal(s)" is unambiguous, is easily understandable by a jury, and requires no construction. For example, claim 1 of the '871 Patent recites that a processor is used to generate "an image data signal representing the image framed by the camera." Claim 1 also provides a "memory" for "receiving and storing the digitized framed image," and a "user interface for enabling a user to select the image data signal for viewing and transmission." Thus, the claim language indicates that the recited "image data signal" relates to the recited "digitized framed image." The claim further recites that it this signal that is transmitted using a telephonic system.

Similarly, the preamble of claim 6 of the '871 Patent recites "converting the visual image to a digitized image data signal and transmitting digitized image data signal via a cellular telephone network." The body of the claim further recites "a memory associated with the processor for receiving and storing the digitized framed image, accessible for selectively displaying in the display window and accessible for selectively transmitting over the cellular telephone network the digitized framed image." Again, this indicates that the recited "image data signal" relates to the recited "digitized framed image." Accordingly, the Court finds that the term "image data signal(s)" should be given its plain and ordinary meaning.

Regarding Defendants' construction, the Court agrees with Plaintiff that it improperly imports the unwarranted limitations that the signal must be modulated. The portion of the specification cited by Defendants starts with "[i]n the exemplary embodiment," and Defendants

have not provided any evidence that the claims should be limited to this embodiment. The claims themselves do not use the word "modulated," and the specification states that "[w]hile specific embodiments have been shown and described herein, it will be understood that the invention includes all modifications and enhancements within the scope and spirit of the claims." '817 at 14:43-47

Regarding the phrase "viewing incoming image data signals," the Court finds that the phrase is unambiguous, is easily understandable by a jury, and requires no construction. First, the plain language of the phrase includes the word "incoming," which indicates receiving from an external source. Second, the specification states that in one embodiment, "the cellular phone can be used as both an input and an output device, and incoming data or stored images can be viewed through the viewfinder." '871 Patent at 10:49–51. Accordingly, the Court finds that the phrase "viewing incoming image data signals" should be given its plain and ordinary meaning.

### 2. Court's Construction

In light of the intrinsic evidence, the phrase **"image data signal(s)"** and the phrase **"viewing incoming image data signals"** will be given their plain and ordinary meaning.

### K. *"image framed by the camera" and "generating a digitized framed image"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"image framed by the camera"** | the image data signal generated by the camera from the field of view | image frame to be captured by the camera |
| **"generating a digitized framed image"** | No construction necessary | creating a single digital image frame from a signal received from the camera |

The parties generally agree that the phrase "image framed by the camera" in the '871 Patent relates to an image that is to be captured. The parties dispute whether it is "the image data signal generated by the camera," as Plaintiff proposes, or whether it is "image frame," as

Defendants propose. Plaintiff argues that the "image framed by the camera" should be understood as the image that is seen in the viewfinder prior to capture by the camera. (Dkt. No. 216 at 14.) Plaintiff argues that Defendants have offered a circular definition, and that the additional words "to be captured" will not provide any clarity. (Dkt. No. 216 at 14.)

Plaintiff further argues that Defendants have improperly changed the meaning of the term "image framed." (Dkt. No. 216 at 14.) Plaintiff contends that Defendants' construction drops the "d" from "framed" thereby turning the verb "framed" into the noun "frame." (Dkt. No. 216 at 14-15.) Plaintiff argues that an "image framed" (as claimed) is very different from an "image frame" (as Defendants propose). (Dkt. No. 216 at 15.) Finally, Plaintiff contends that Defendants' construction is inconsistent with the specification, because the signal could be a series of images, or a video feed, and is not an image frame. (Dkt. No. 216 at 15) (citing '871 Patent at 9:57).

Regarding Defendants' construction for "generating a digitized framed image," Plaintiff argues that Defendants have reconstructed the claimed phrase "framed image" with the phrase "image frame," which improperly changes the meaning of claimed language. (Dkt. No. 216 at 16.) Plaintiff further argues that Defendants have merely replaced that word "generating" with "creating." (Dkt. No. 216 at 16.) Plaintiff contends that "generating" is understandable and should be left undisturbed. (Dkt. No. 216 at 16.) Finally, Plaintiff argues that Defendants' construction excludes the embodiments of the '871 Patent that relate to the capture of video images in so far as it requires only a "single digital image frame" to be generated. (Dkt. No. 216 at 16) (citing '871 Patent at 1:37–39.)

Defendants respond that the summary of the invention recites that captured video images are "converted into still frame digitized format for transmission." (Dkt. No. 224 at 21) (citing

'871 Patent at 1:39–41). Defendants contend that the patentee defined the terms "image" and "images" as "single frame[s]." (Dkt. No. 224 at 21) (citing '871 Patent at 4:58–62). Defendants further argue that the patentee disclosed how a stream of signals from a camera is broken down into distinct frames before they are stored in the memory, or transmitted. (Dkt. No. 224 at 22.) (citing '871 Patent at 8:3–25). Defendants argue that this frame-by-frame correlation of data before storage, transmission or display is reiterated throughout the specification. (Dkt. No. 224 at 22) (*See, e.g.*, *id.*, 8:39–42; 9:60–63). According to Defendants, their construction clarifies that the limitations at issue correspond to specific frames, rather than a continuous and undefined stream of signals. (Dkt. No. 224 at 22.)

For the following reasons, the Court finds that the phrase **"image framed by the camera"** and the phrase **"generating a digitized framed image"** should be given their plain and ordinary meaning.

### 1. Analysis

The phrase "image framed by the camera" appears claims 1, 9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that in the context of the surrounding claim language, the phrase is unambiguous, is easily understandable by a jury, and requires no construction. For example, claim 1 recites "a display for displaying an image framed by the camera." Claim 1 further recites that it is the processor that is later used "for generating an image data signal representing the image framed by the camera." Likewise, claim 9 recites "a display ... for framing the image to be captured by an image capture device and for viewing the image, whereby an operator can view and frame the image prior to capture." Thus, the claim language indicates that the recited "image framed by the camera" is the image displayed in the display. This claim language is not confusing, and the Court finds that the phrase should be

given its plain and ordinary meaning.

Furthermore, the Court agrees with Plaintiff that Defendants' construction improperly changes the meaning of the term "image framed" to "image frame," by dropping the "d" from frame. Defendants' construction not only improperly redrafts the claim language from the verb "framed" to the noun "frame," but also improperly limits the claims to one disclosed embodiment. The Court finds that a person of ordinary skill in the art would understand that the recited "image framed by the camera" could be a series of images, or a video feed, and is not limited to an "image frame."

Turning to the phrase "generating a digitized framed image," the Court finds that the phrase appears claims 9 and 12 of '871 Patent. Specifically, claims 9 and 12 recite "a processor for processing the image framed by the camera for generating a digitized framed image as displayed in the display." Like the phrase "imaged framed by the camera," the phrase "generating a digitized framed image" is unambiguous, is easily understandable by a jury, and requires no construction. To the extent that Defendants argue that "generating a digitized framed image" corresponds to specific frames, rather than a continuous and undefined stream of signals, the Court rejects this argument.

### 2. Court's Construction

In light of the intrinsic evidence, the phrase **"image framed by the camera"** and the phrase **"generating a digitized framed image"** will be given their plain and ordinary meaning.

### L. "digitiz[e][ed][ing]"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"digitiz[e][ed][ing]"** | No construction necessary | analog to digital conversion |

The parties dispute whether the term "digitized" in the '871 Patent should be construed as "analog to digital conversion," as Defendants propose. Plaintiff argues that "digitized" is a term

that is readily understood, and that Defendants' construction improperly narrows the claim. (Dkt. No. 216 at 15.) Plaintiff also argues that Defendants' construction is circular because it uses the word "digital" to define "digitize." (Dkt. No. 216 at 15.) Plaintiff further contends that the specification does not support the requirement that an analog to digital conversion must occur. (Dkt. No. 216 at 15) (citing '871 Patent at 1:37–39, 5:29–31). According to Plaintiff, Defendants' construction would improperly exclude those embodiments where the image was captured by a digital camera. (Dkt. No. 216 at 16.)

Defendants respond the claim language refers to signals that have been converted from analog to digital. (Dkt. No. 224 at 22.) According to Defendants, the claim language reflects the notion that the signal has been converted. (Dkt. No. 224 at 22.) Defendants further argue that their definition is not circular because "digitize" is a verb, an action meaning to convert something from analog into digital form, and "digital" is an adjective describing the format in which something exists, which is also the result of digitizing. (Dkt. No. 224 at 22-23.)

Regarding Plaintiff's argument that Defendants' construction excludes a preferred embodiment, Defendants argue that each claim in a patent need not cover every embodiment. (Dkt. No. 224 at 23.) Defendants further contend that regardless of whether a digital camera falls within the purview of the particular claims at issue that require digitizing, the digital camera embodiment was explicitly claimed elsewhere. (Dkt. No. 224 at 23.) Defendants argue that Plaintiff is ignoring the term entirely. (Dkt. No. 224 at 23.)

Plaintiff replies that for something to be "digitized," it must be made digital. (Dkt. No. 231 at 8.) Plaintiff argues that one possibility is that it be converted to a digital format, and another possibility is that it be created in a digital format. (Dkt. No. 231 at 8.) Plaintiff contends that the second concept is captured in the specification by disclosing a digital camera device.

(Dkt. No. 231 at 8-9) (citing '871 Patent at 1:37–39, 5:29–31).  Plaintiff also argues that Defendants concede that their proposed construction would improperly exclude those embodiments where the image was captured by a digital camera. (Dkt. No. 231 at 9.)

For the following reasons, the Court finds that the term **"digitized"** should be construed as **"created in or converted to digital format."**

### 1.  Analysis

The term "digitized" appears claims 1, 6, 9, and 12 of the '871 Patent.  The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim.  During the *Markman* hearing, Defendants argued that the term "digitized" requires the Court to import a temporal limitation into the apparatus claims.  Defendants argued that the parties agree that all signals will start as analog signals, and that the claims inherently require the claimed apparatus to convert an analog signal to digital signal at some unspecified point.  Contrary to Defendants' contention, the Court finds that the intrinsic evidence does not require the temporal limitation that Defendants seek to read into the claims. *See Cordis Corp. v. Medtronic AVE, Inc.*, 339 F.3d 1352, 1357 (Fed. Cir. 2003) (declining to superimpose a process limitation on the product claims at issue).

The claims recite "digitized framed image," "digitized audio signals," "digitized alphanumeric signals," "digitized signals," "digitized image data signal," or "digitized image signals."  None of these terms necessarily require that these "digitized" signals be "converted" by the claimed apparatus.  As Plaintiff contends, the claims do not recite when or how these signals were "digitized."  Instead, consistent with the specification, the signal could either be created in digital format or converted to digital format.  Indeed, the specification states that "[e]mbodiments permit capture of a video image using a digital camera." '871 Patent at 1:37–39.  Similarly, the specification states that "an embodiment incorporates an image capture device

such as a standard analog or digital camera device." *Id*. at 5:29–31.  An image captured by a digital camera could be "created in" digital format.

Indeed, Defendants argued at the *Markman* hearing that certain digital cameras take pictures without converting an analog signal to a digital signal.  However, given the disclosed embodiments discussed above, Defendants have provided no evidence that these type of digital cameras were disclaimed or disavowed from the scope of the claims.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276-77 (Fed. Cir. 2008) ("We normally do not interpret claim terms in a way that excludes embodiments disclosed in the specification ...").  Moreover, the Court is not persuaded by Defendants' argument that the claims need not cover every embodiment, or that the patentee intended this by drafting a dependent claim in a different patent. (Dkt. No. 224 at 23.)

Finally, the extrinsic evidence submitted by Defendants defines "digitize" as "to express analog data in digital form." (Dkt. No. 272-2 at 2) (The Authoritative Dictionary of IEEE Standards Terms 7th Ed. at 289.).  To "express" something in digital form is the same as "creating in" digital form.  The same extrinsic evidence also defines "digitize" as "to convert an analog signal to a digital signal." *Id.*  Both of these definition are consistent with the Court's finding that "digitized" should be construed as "created in or converted to digital format."

## 2.  Court's Construction

In light of the intrinsic evidence, the Court construes the term **"digitized"** as **"created in or converted to digital format."**

### M. *"telephone network"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"telephone network"** | No construction necessary | public circuit switched telephone network |

The parties dispute whether the term "telephone network" in the '871 Patent should be construed as "public circuit switched telephone network," as Defendants propose. Plaintiff argues that the phrase "public circuit switched" has no corresponding claim language and appears nowhere in the specification. (Dkt. No. 216 at 17.) Plaintiff further argues that Defendants' construction is circular because it defines a "telephone network" as a "… telephone network." (Dkt. No. 216 at 17.) Plaintiff contends that Defendants have narrowed the claimed term by requiring it to be construed as a subset of itself. (Dkt. No. 216 at 17.) Finally, Plaintiff argues that neither the claims, the specification nor the prosecution history require or mention a public circuit switch telephone network. (Dkt. No. 216 at 18.) According to Plaintiff, the claims compel the opposite by reciting a "wireless telephone network" or a "cellular telephone network."

Defendants respond that the common phrase, "telephone network," provides the foundation for identifying the claimed and unclaimed structures. (Dkt. No. 224 at 24.) Defendants contend that the Public Switched Network is "[a]ny common carrier network that provides circuit switching between public users." (Dkt. No. 224 at 24) (quoting Dkt. No. 224-7 (Newton's Telecom Dictionary, January 1988 at 538)). Defendants argue that the specification reinforces this conventional understanding of the telephone network, by disclosing circuitry for connection to a "telephone company system." (Dkt. No. 224 at 24) ('871 Patent at 8:66, 9:6). Defendants contend that this telephone company system is the "public circuit switched telephone network." (Dkt. No. 224 at 24.) Finally, Defendants argue that the public telephone network

connection to the cellular telephone is expressly distinct from "radio frequency, satellite transmission or the like." (Dkt. No. 224 at 24) (quoting '871 Patent at 9:31–41).

For the following reasons, the Court finds that the term **"telephone network"** should be given its plain and ordinary meaning.

### 1. Analysis

The term "telephone network" appears claims 1, 6, 9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. Contrary to Defendants' contention, the intrinsic evidence does not indicate that the term should be limited to a public circuit switched telephone network. Indeed, Defendants' construction would improperly limit the broader term "telephone network" to one type of telephone network. Although the specification provides an embodiment that patches directly into "telephone company system," this embodiment does not limit the broader term "telephone network." '871 Patent at 9:1–9. Moreover, neither the specification nor the prosecution history require or mention a public circuit switched telephone network. Finally, the Court finds that the term is unambiguous, is easily understandable by a jury, and requires no construction. To the extent that Defendants contend that the plain and ordinary meaning of "telephone network" requires a circuit switched network, the Court rejects this argument because it is inconsistent with how a person of ordinary skill would interpret the claims.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"telephone network"** will be given its plain and ordinary meaning.

### N. "selectively transmitting" and "selectively displaying"

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"selectively transmitting"** | to select from among a group of images retained in memory for transmission | Plain and ordinary meaning or choosing between transmitting images as they are captured or transmitting recalled images |
| **"selectively displaying"** | to select from among a group of images retained in memory for display | choosing from one or more for display |

The parties generally agree that the terms "transmitting" and "displaying" in the '871 Patent should be given their plain and ordinary meaning. The parties dispute whether "selectively" means "selecting from among a group," as Plaintiff propose, or if it means "choosing between transmitting images as they are captured or transmitting recalled images," as Defendants propose for the term "selectively transmitting." For the term "selectively displaying," Defendants propose that the term "selectively" means "choosing from one or more for display."

Plaintiff argues that the term "selectively" cannot mean two different things, as Defendants propose. (Dkt. No. 216 at 18.) Plaintiff contends that for selective transmission, the specification teaches "selective recall of captured images for transmission." (Dkt. No. 216 at 19) (citing '871 Patent at 5:9–10). Plaintiff argues that this means selecting from a group of captured images for transmission. (Dkt. No. 216 at 19.) Plaintiff also argues that the specification teaches selecting from a group of images to recall and view before transmission. (Dkt. No. 216 at 19.) Plaintiff further argues that the prosecution history shows that claim language was added to reflect the patentably distinguishing functionality of providing the ability for the user to selectively transmit and display images from memory. (Dkt. No. 216 at 19) (citing Dkt. No. 216-5 (September 7, 2007 Office Action Response) and 216-6 (Examiner's Amendment)). Finally, Plaintiff argues that the extrinsic record supports Plaintiff's proposed

definition. (Dkt. No. 216 at 20) (citing Dkt. No. 216-7 at 1 (http://www.merriam-webster.com/dictionary)).

Defendants argue that the terms are readily understandable to the jury and no construction is necessary. (Dkt. No. 224 at 25.) Defendants contend that Plaintiff's proposed construction is incorrect because it attempts to read in an embodiment from the specification by requiring that the user choose an image from a group, *i.e.,* a set of two or more images. (Dkt. No. 224 at 25.) Defendants argue that the plain language of the claims indicates that a user could "selectively" transmit or display a single image just as he could select an image from a group of two or more. (Dkt. No. 224 at 25.) Defendants further argue that the cited portion of the file history says nothing about selecting from a group of images. (Dkt. No. 224 at 25) (citing Dkt. No. 216-5). Defendants contend that the patentee never argued that his invention required the user to select from a group of two or more images before transmitting or displaying an image. (Dkt. No. 224 at 25.)

For the following reasons, the Court finds that the phrase **"selectively transmitting"** should be construed as **"selecting at least one digitized framed image retained in memory and transmitting that selection,"** and that the phrase **"selectively displaying"** should be construed as **"selecting at least one digitized framed image retained in memory and displaying that selection."**

### 1. Analysis

The phrase "selectively transmitting" appears claims 1, 6, 9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The phrase "selectively displaying" appears claims 1, 6, 9, and 12 of the '871 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the claims indicate that the

disputed phrases relate to selecting a digitized framed image from a memory. For example, claim 1 of the '871 Patent recites "memory associated with the processor for receiving and storing the digitized framed image, accessible for selectively displaying in the display window and accessible for selectively transmitting over the wireless telephone network the digitized framed image." Thus, the plain language of the claim requires selecting at least one digitized framed image. Moreover, the prosecution history indicates that this claim language was added to distinguish the prior art. Specifically, in describing the prior art, the patentee argued:

> In either case, there is no teaching that the "prescribed picture" stored in memory is selectively displayed by the local user so that he can determine whether to transmit it to the remote station. In fact, Ida does not even disclose any electrical connection which would permit the photograph stored in the memory section 24 to be displayed on the display 12.

(Dkt. No. 216-5 at 3) (September 7, 2007 Office Action Response) (emphasis in original). The claims were then amended to recite that the memory is "accessible for selectively displaying in the display window and accessible for selectively transmitting over the wireless telephone network the digitized framed image." (Dkt. No. 216-6 at 2) (Examiner's Amendment). Accordingly, the Court finds that the intrinsic evidence indicates that "selectively" means "selecting at least one."

The Court also agrees with Defendants that a user could "selectively" transmit or display a single image and is not limited to selecting an image from a group of two or more. The patentee did not argue that selecting an image from a group of two or more was a distinguishing feature. However, the Court disagrees with Defendants that "selectively" should be construed differently for these two disputed terms. The intrinsic evidence does not require "choosing between transmitting images as they are captured or transmitting recalled images," as Defendants propose. Instead, it only requires selecting at least one digitized framed image retained in memory for transmission.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the phrase **"selectively transmitting"** as **"selecting at least one digitized framed image retained in memory and transmitting that selection,"** and the phrase **"selectively displaying"** as **"selecting at least one digitized framed image retained in memory and displaying that selection."**

### O. *"camera control circuit"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"camera control circuit"** | Not a means-plus-function claim; no construction necessary | construe "circuit" as: a physical pathway of connected electrical elements for converting digital data into analog control signals |

The parties dispute whether the term "camera control circuit" in the '871 Patent should be construed as "a physical pathway of connected electrical elements for converting digital data into analog control signals," as Defendants propose. Plaintiff argues that Defendants' construction improperly narrows the term "circuit" by requiring it to perform the specific function of "converting digital data into analog control signals." (Dkt. No. 216 at 25.) Plaintiff notes that the specification discloses an embodiment which has "camera operation control capability through the use of digital/analog circuits for converting digital commands to analog signals for controlling the gain, pedestal, setup, white clip, lens focus, white balance lens iris, lens zoom and other functions of the camera." (Dkt. No. 216 at 25) (citing '871 Patent at 2:59–64). Plaintiff argues that Defendants seek to improperly confine this term to this particular embodiment. (Dkt. No. 216 at 25.) According to Plaintiff, claim 12 does not specify a digital/analog circuit, but more broadly requires a "camera control circuit." (Dkt. No. 216 at 25.) Finally, Plaintiff argues that Defendants' extrinsic evidence does not support their construction because neither dictionary definition supports the requirement that a circuit be "for converting digital data into

analog control signals." (Dkt. No. 216 at 25.)

Defendants respond that the specification discloses a very specific camera control circuit. (Dkt. No. 224 at 32.) Defendants argue that the specification makes clear that the camera control circuit is hardware and converts digital signals to analog signals. (Dkt. No. 224 at 32) (citing '871 Patent at 11:35–39). Defendants argue that the camera module outputs signals to the camera control digital to analog converter and therefore, the digital output of the camera module controls camera functions only after being converted by the camera control circuit to analog signals for that purpose. (Dkt. No. 224 at 32.) According to Defendants, the "camera control circuit" limitation is a physical pathway of connected electrical elements for converting digital data into analog control signals. (Dkt. No. 224 at 33) (citing Dkt. No. 224-7 at 4  (Newton's Telecom Dictionary, 13th Ed., 1998, at 147)).

Plaintiff replies that the '871 Patent specification states a circuit may be adapted "for converting digital data into analog control signals," but claim 12 contains no such requirement. (Dkt. No. 231 at 10.) Plaintiff argues that Defendants attempt to improperly re-write the claim language by importing limitations from the specification. (Dkt. No. 231 at 10.) According to Plaintiff, the term "circuit" is understandable and requires no construction.

For the following reasons, the Court finds that the term **"camera control circuit"** should be given its plain and ordinary meaning.

### 1. Analysis

The term "camera control circuit" appears in claim 12 of the '871 Patent. The Court finds that the specification discloses an embodiment which has the "camera operation control capability through the use of digital/analog circuits for converting digital commands to analog signals for controlling the gain, pedestal, setup, white clip, lens focus, white balance lens iris, lens zoom and other functions of the camera." '871 Patent at 2:59–64. The specification also

states that "Fig. 8, part C includes the camera module 332 and the camera control digital to analog converter 334." '871 Patent at 11:35–39. However, in both instances, the specification states that this disclosure is one embodiment or an exemplary schematic diagram. Importantly, claim 12 does not specify that the recited circuit is a digital/analog circuit. Instead, claim 12 more broadly recites "camera control circuit," and does not include the specification language of "for converting digital data into analog control signals." Accordingly, the Court will not import this limitation from the specification into the claims. *See Phillips*, 415 F.3d at 1323 (holding that while claim terms are understood in light of the specification, a claim construction must not import limitations from the specification into the claims).

Finally, the Court finds that the term is unambiguous, is easily understandable by a jury, and requires no construction. Indeed, the extrinsic evidence submitted by Defendants does not provide further clarity and does not define a circuit as "converting digital data into analog control signals." To the extent that Defendants contend that the plain and ordinary meaning of "camera control circuit" requires "converting digital data into analog control signals," the Court rejects this argument because it is inconsistent with how a person of ordinary skill would interpret the claims.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"camera control circuit"** will be given its plain and ordinary meaning.

### P. *"transmission protocol"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "transmission protocol" | a formal set of conventions governing the format and relative timing of message exchange between two communications terminals | one or more rules governing transmission |

The parties dispute whether the term "transmission protocol" in the '168 Patent should be

construed as "a formal set of conventions governing the format and relative timing of message exchange between two communications terminals," as Plaintiff proposes, or as "one or more rules governing transmission," as Defendants propose. Plaintiff argues that Defendants' construction is circular because it uses the word "transmission" to define "transmission protocol." (Dkt. No. 216 at 20.) Plaintiff argues that its construction is consistent with the teaching in the specification. (Dkt. No. 216 at 20) (citing '168 Patent at 3:41–44, 13:58–60). Plaintiff further argues that its construction is supported by the extrinsic record. (Dkt. No. 216 at 20) (Dkt. No. 216-4 at 7 (The Authoritative Dictionary of IEEE Standards Terms 7th Ed. at 882)).

Defendants respond that Plaintiff's proposal is needlessly complex, would read out a preferred embodiment, and introduces new ambiguity that would unnecessarily confuse the jury. (Dkt. No. 224 at 33.) Defendants argue that Plaintiff's construction would require the jury to determine whether transmissions are sent according to a "formal set of conventions," not just a rule or rules governing transmission. (Dkt. No. 224 at 33.) Defendants further argue that Plaintiff's construction reads in an unsupported narrowing requirement that the protocol governs the "exchange" of messages between the claimed device and a second unspecified communications terminal. (Dkt. No. 224 at 33.) Defendants contend that Plaintiff's construction would read out the transmission protocols for "facsimile documents" and "captured visual images," by limiting the terms to "messages." (Dkt. No. 224 at 33.) Finally, Defendants argue that their construction is not contradicted by the extrinsic evidence cited by Plaintiff. (Dkt. No. 224 at 33.)

For the following reasons, the Court finds that the term **"transmission protocol"** should be construed as **"set of conventions or rules governing transmission."**

### 1. Analysis

The term "transmission protocol" appears in claims 16-18 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court agrees with Defendants that Plaintiff's construction is needlessly complex and introduces ambiguity that would confuse the jury. For example, the claims do not recite "communications terminals," and it is unclear what these communication terminals are or where they are located. Moreover, the extrinsic evidence submitted by Plaintiff indicates that a person of ordinary skill in the art would understand transmission protocol to mean "a set of conventions or rules governing transmission." The definition of the word "protocol," submitted by Plaintiff, repeatedly uses the words "set of rules" or "set of conventions" in its ten sub-parts. (Dkt. No. 216-4 at 7 (The Authoritative Dictionary of IEEE Standards Terms 7th Ed. at 882)).

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term **"transmission protocol"** as **"set of conventions or rules governing transmission."**

### *Q.* *"media"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"media"** | No construction necessary | a removable storage device |

The parties dispute whether the term "media" in the '168 Patent should be construed as "a removable storage device," as Defendants propose. Plaintiff argues that nothing in the claims suggests that media equates to a removable storage device. (Dkt. No. 216 at 21.) Plaintiff contends that the plain and ordinary meaning of the claims require the media to be suitable to embody a compression algorithm. (Dkt. No. 216 at 21.) Plaintiff argues that Defendants' contention that the storage device is removable is inconsistent with the claims, because each of the claims recite that the media is supported by the portable housing. (Dkt. No. 216 at 21.)

Plaintiff further argues that Defendants' construction contradicts the specification, which teaches that "media" in and of itself is not removable. (Dkt. No. 216 at 22.) According to Plaintiff, the specification refers to "portable media," which means that media as a standalone term, as used in the specification is not portable or removable. (Dkt. No. 216 at 22) ('168 Patent at 8:58–62). Plaintiff further argues that the specification discusses memory devices that are both removable and not removable from the housing. (Dkt. No. 216 at 22) ('168 Patent at 27–31). Plaintiff contends that Defendants' construction therefore improperly excludes embodiments of the '168 Patent. (Dkt. No. 216 at 22.)

Defendants respond that each claim expressly links "media" to compression, and that the specification uses compression in conjunction with portable media that is removable. (Dkt. No. 224 at 34.) Defendants further argue that FIGS. 5, 6B, 6C, and 7A illustrate a portable RAM memory in the form of a removable image card (*e.g.*, a PCMCIA SRAM card or a PCMCIA Flash RAM card). (Dkt. No. 224 at 34.) Defendants argue that the claims themselves expressly differentiate between "media" and "memory," thus indicating that "memory" can be non-removable, and "media" is only removable. (Dkt. No. 224 at 34.)

Plaintiff replies that Defendants' arguments are improperly limited to "media" in the context of compression. (Dkt. No. 231 at 9.) Plaintiff argues that in the context of claim 16, it is a processing platform that operates the transmission protocol algorithm that is "embodied in suitable media," which suggests that media may be similarly affixed. (Dkt. No. 231 at 9.) Plaintiff further argues that the claims recite that the "media" must be "supported by the portable housing," and therefore cannot be removable. (Dkt. No. 231 at 10.) Finally, Plaintiff argues that the plain and ordinary meaning of the term "media" is "[a]ny readable or writable data storage area." (Dkt. No. 231 at 10) (quoting Dkt. No. 231-2 at 4 (The Authoritative Dictionary of IEEE

Standards Terms 7th ed., 2000 at 682)).

For the following reasons, the Court finds that the term **"media"** should be given its plain and ordinary meaning.

### 1. Analysis

The term "media" appears claims 1, 16, 18, 22, 24, 26, 27, and 29 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. Contrary to Defendants' contention, the intrinsic evidence does not indicate that the term should be limited to a removable storage device. The specification distinguishes between "integral" media and "portable" or "removable" media. For example, the specification states that "the interim compression/decompression scheme is particularly useful when all of the image data is to be permanently archived, or when limited capacity *portable media* are used, such as, by way of example, floppy disks or a *portable* PCM CIA card." '168 Patent at 7:58–62 (emphasis added). Likewise, the specification states that "[t]he configuration shown in FIG. 6B … may include an *integral* RAM and/or the *removable* memory module as indicated by the image card 72." '168 Patent at 11:24–28 (emphasis added).

Consistent with the specification, the claims indicate that the media can be either integral or removable. Indeed, Defendants' construction would improperly limit the broader term "media" to only "removable" media. Defendants' construction is also inconsistent with the extrinsic evidence submitted by Plaintiff, which defines "media" as "any readable or writable data storage area." (Dkt. No. 231-2 at 4) (The Authoritative Dictionary of IEEE Standards Terms 7th ed., 2000 at 682). However, the Court is not persuaded by Plaintiff's argument that the recited "media" cannot be removable. As discussed above, Plaintiff's contention would exclude embodiments disclosed in the specification.

In light of the intrinsic and extrinsic evidence, the Court finds that the term "media" is

unambiguous, is easily understandable by a jury, and requires no construction.  To the extent that a party contends that the plain and ordinary meaning of "media" excludes it from being either integral or removable, the Court rejects this argument because it is inconsistent with how a person of ordinary skill would interpret the claims.

### 2.  Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"media"** will be given its plain and ordinary meaning.

### R.  *"viewfinder"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"viewfinder"** | an electronic device associated with a camera for depicting a view of the area of the subject to be included in the picture | a device for depicting a view |

The parties agree that a "viewfinder" in the '168 Patent is a device for depicting a view. The parties dispute whether the recited viewfinder must be: (1) electronic, (2) associated with the camera, and (3) depicting a view of the area of the subject to be included in the picture, as Plaintiff proposes.  Plaintiff argues that the specification describes the viewfinder as being capable of viewing incoming data or stored images (citing '168 Patent at 11:35–38), having an "LCD unit" (citing '168 Patent at 11:64–65), and having circuitry (citing '168 Patent at 13:9–11). (Dkt. No. 216 at 24.)  Plaintiff argues that the claims all discuss the viewfinder's suitability to "receive visual image data" or the like. (Dkt. No. 216 at 24.)   According to Plaintiff, the specification and the claims indicate that the viewfinder is electronic. (Dkt. No. 216 at 24.)

Plaintiff next argues that specification indicates that the viewfinder is associated with the camera. (Dkt. No. 216 at 24) (citing '168 Patent at 10:47, 11:57–59).  Finally, Plaintiff argues that the intrinsic and extrinsic evidence indicates that the viewfinder is for depicting a view of

the area of the subject to be included in the picture. (Dkt. No. 216 at 24) (citing http://www.merriam-webster.com).

Defendants respond that Plaintiff's construction improperly requires the viewfinder to be "[a]n electronic device." (Dkt. No. 224 at 35.) According to Defendants, claims 13, 23, 28, and 31 each contemplate embodiments in which "a display screen [is] apart from the viewfinder," which the parties agree means that "[t]he display screen is separate from the viewfinder." (Dkt. No. 224 at 35) (citing Dkt. No. 194 (Jt. Claim Construction Statement)). Defendants further argue that the specification describes embodiments in which image data is viewed through the viewfinder but makes clear that the image data is not received or displayed by the viewfinder itself. (Dkt. No. 224 at 35.) Defendants argue that in one embodiment, an "LCD unit may be positioned to be visible through the viewfinder 194 or may be in a separate back window 198." (Dkt. No. 224 at 35) (quoting '168 Patent 11:64–65). Finally, Defendants argue that a person of ordinary skill in the art would not have interpreted "viewfinder" to be limited to electronic devices. (Dkt. No. 224 at 35) (citing Dkt 224-11 at 4 (McGraw-Hill Dictionary of Scientific and Technical Terms)).

For the following reasons, the Court finds that the term **"viewfinder"** should be given its plain and ordinary meaning.

## 1. Analysis

The term "viewfinder" appears claims 10-13, 23, 25, 28, and 31 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court agrees with Defendants that Plaintiff's construction improperly requires the viewfinder to be "[a]n electronic device." Plaintiff argues that the specification describes the viewfinder as being capable of viewing incoming data or stored images. (Dkt. No. 216 at 24.) First, the specification states that the images may be viewed

through the viewfinder, and does not state that the images must be viewed through the viewfinder. '168 Patent at 11:35–39. Indeed, the specification explicitly states that the LCD for viewing the images "may be positioned to be visible through the viewfinder 194 or may be in a separate back window 198." '168 Patent at 11:64–65.

Moreover, claims 13, 23, 25, 28, and 31 recite that the display screen for viewing the visual data is "defined apart from the viewfinder." The parties have agreed that the phrase "a display screen apart from the viewfinder" should be construed as "the display is separate from the viewfinder." Thus, the intrinsic evidence is not consistent with Plaintiff's argument that the viewfinder must be an electronic device. Instead, the extrinsic evidence is consistent with the understanding that the viewfinder does not have to be an electronic device. (Dkt. No. 224-11 at 4 (McGraw-Hill Dictionary of Scientific and Technical Terms) (defining "viewfinder" as "[a]n auxiliary optical or electronic device attached to a television camera so the operator can see the scene as the camera sees it")).

Regarding Plaintiff's argument that the viewfinder is a device to be associated with the camera, and is for depicting a view of the area of the subject to be included in the picture, the Court finds that the independent claims of the '168 Patent do not recite a "camera." It is only one dependent claim (claim 7), that explicitly recites "camera supported by the portable housing." It would be improper to redraft the claims to associate the recited "viewfinder" with an unrecited camera element. Moreover, the Court finds it is unnecessary and does not significantly add to the understanding of the term viewfinder. Each of the independent claims of the '168 Patent recite that the image collection device is operable to provide "visual image data of a field of view." This is consistent with the extrinsic evidence submitted by the parties. (Dkt. No. 216-8 at 1 (http://www.merriam-webster.com) (defining "viewfinder" as "A device on a

camera for showing the area of the subject to be included in the picture.")); (Dkt. No. 224-11 at 4 ("McGraw-Hill Dictionary of Scientific and Technical Terms) (defining "viewfinder" as "A device which provides the user of a camera with the view of the subject that is focused by the lens.")).

Accordingly, the Court finds that the term is unambiguous, is easily understandable by a jury, and requires no construction. To the extent that Plaintiff contends that the plain and ordinary meaning of "viewfinder" requires it to be electronic and associated with the camera, the Court rejects this argument because it is inconsistent with how a person of ordinary skill would interpret the claims.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"viewfinder"** will be given its plain and ordinary meaning.

### S. *"processing platform"*

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **"processing platform"** | an electronic system for processing digital data | No construction necessary |

The parties dispute whether the term "processing platform" in the '168 Patent requires construction. Defendants originally proposed that the term should be construed as "interconnected modular electronics for processing digital data." (Dkt. No. 194-3 at 50.) Defendants now contend that the term does not require construction. (Dkt. No. 241 at 11.) Regarding Defendants' original construction, Plaintiff argues Defendants' "interconnected modular electronics" language is unsupported by the specification. (Dkt. No. 216 at 23.)

Plaintiff contends that the term "interconnect" is used in conjunction with a "CRT electronic board" and does not relate to the broader processing platform. (Dkt. No. 216 at 23.)

Plaintiff further argues that the term "modular" appears just once in the specification, and in a different context and is unrelated to the processing platform. (Dkt. No. 216 at 23) (citing '168 Patent at 1:33–36). Plaintiff contends that the specification describes the processor and the "circuitry supporting the processor" (*i.e.*, the processing platform), as "the processor chip 86 and the control store memory (ROM, Flash RAM, PROM, EPROM or the like) 92 for storing the software program executed by the processor." (Dkt. No. 216 at 23) (quoting '168 Patent at 9:20–24). According to Plaintiff, there is no requirement that the "processing platform" be modular or interconnected. (Dkt. No. 216 at 23.) Defendants did not provide an opposition, and now contend that the term does not require construction.

For the following reasons, the Court finds that the term **"processing platform"** should be given its plain and ordinary meaning.

### 1. Analysis

The term "processing platform" appears in claims 1, 2, 16, 18, 22, 24, 26, and 27 of the '168 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. In light of the intrinsic and extrinsic evidence, the Court finds that the term "processing platform" is unambiguous, is easily understandable by a jury, and requires no construction. Indeed, Defendants argue that the term does not require construction. (Dkt. No. 241 at 11.) To the extent that Defendants contend that the plain and ordinary meaning of "processing platform" requires "interconnected modular electronics," the Court rejects this argument because it is inconsistent with how a person of ordinary skill would interpret the claims.

### 2. Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"processing platform"** will be given its plain and ordinary meaning.

## V. CONCLUSION

The Court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

**SIGNED this 25th day of March, 2015.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE